**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 17-338 |
| | ) | |
| LAMAR RICE, | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSION OF LAW

CONTI, Senior District Judge

## I.     INTRODUCTION

Pending before the court is a motion to suppress evidence (ECF No. 43) filed by defendant Lamar Rice ("defendant"). Rice is charged in a criminal indictment with: (1) possession with intent to distribute 100 or more marijuana plants, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii); (2) maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1); and (3) possession of ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 16.) The charges in the indictment are based upon evidence that was obtained pursuant to four search warrants issued by a federal magistrate judge to search the following property: (a) 321 Fifth Avenue, McKeesport, Pennsylvania 15132 ("321 Fifth Avenue") (ECF No. 43-1); (b) a 2006 Nissan Frontier driven by defendant ("defendant's vehicle") (ECF No. 43-2);[1] (c) 551 Fourth Street, Pitcairn, Pennsylvania ("defendant's residence") (ECF No. 43-3); and (d) defendant's person (ECF No. 43-4). The applications for the four search warrants were supported by the same affidavit of probable cause authored by

---

[1]     Defendant does not challenge the constitutionality of the search warrant issued for the 2006 Nissan Frontier.

Leonard Piccini ("Piccini"), a special agent with the United States Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI"). (ECF No. 43-6.)

According to defendant, the affidavit of probable cause does not support the issuance of three of the four search warrants and contains a falsity. Defendant argues that the evidence obtained pursuant to the four warrants should be suppressed under the Fourth Amendment to the United States Constitution. On October 26, 2018, the government filed a response in opposition to the motion to suppress evidence. (ECF No. 45.) The government argues that defendant lacks standing to challenge the search of 321 Fifth Avenue, the search warrants were supported by probable cause, and, in any event, the good faith exception would apply to law enforcement's searches in this case.

On November 29, 2018, the court held a hearing with respect to defendant's motion to suppress. The government presented the testimony of Piccini and entered four exhibits into evidence. (H.T. 11/29/2018 (ECF No. 54) at 12.) For the reasons set forth in these findings of fact and conclusions of law, and, as set forth on the record at the hearing held on November 29, 2018, the motion to suppress will be denied.

## II.  FINDINGS OF FACT[2]

### A.  The McKeesport Building

**FOF 1.**            321 Fifth Avenue is one of three parcels in a large, three-story building located in McKeesport, Pennsylvania (the "McKeesport Building"). (ECF Nos. 43-7,

---

[2]      For purposes of a motion to suppress, the court "may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." United States v. Raddatz, 447 U.S. 667, 679 (1980); Brosius v. Warden, 278 F.3d 239, 246 n.4 (3d Cir. 2002) ("Hearsay may be considered in a suppression hearing in a federal court.") (citing Raddatz, 447 U.S. at 679)).

43-8.) The McKeesport Building has at least four front doors, (H.T. 11/29/2018 (ECF No. 54) at 14), and three separate addresses: (1) 315 Fifth Avenue; (2) 317 Fifth Avenue; and (3) 321 Fifth Avenue, (ECF No. 43-8).

**FOF 2.**  One of the middle doors in the front of the McKeesport Building was labeled "321." (H.T. 11/29/2018 (ECF No. 54) at 32.)

**FOF 3.**  Prior to drafting the affidavit of probable cause, Piccini provided the address of "321 Fifth Avenue" to "an analytical support individual who conducted checks, property-type checks" with respect to that address. (Id. at 30.) The analytical support individual provided Piccini with information about "a possible foreclosure"[3] of the McKeesport Building. (Id. at 35.)

**FOF 4.**  Piccini explained that someone could tell "by looking at…[the McKeesport Building] that there were, at one time,…several different parcels." (H.T. 11/29/2018 (ECF No. 54) at 35.)

### B. Piccini's Reliance upon Two Confidential Sources

**FOF 5.**  In late October 2017, a confidential source, i.e., "CS 1," provided information about defendant to Piccini. (ECF No. 43-6 ¶¶ 12-16.) CS 1 had prior felony convictions and previously provided law enforcement "verified" information that "directly led to multiple narcotics seizures and two Federal Search Warrants." (Id. ¶ 12.)

**FOF 6.**  In late October 2017, CS 1:

    a. informed Piccini that defendant for more than one year had been growing marijuana at 321 Fifth Avenue and defendant currently operated a large-scale marijuana grow operation in the building (ECF No. 43-6 ¶ 13);

---

[3]  Piccini explained: "I had some knowledge that maybe the City had it, or it was a sheriff sale, or there was something like that that I knew." (H.T. 11/29/2018 (ECF No. 54) at 36.)

b. took photographs while inside 321 Fifth Avenue, one photograph of which was attached to the affidavit of probable cause and "depicts a complex marijuana grow operation with a lighting system" and "a significant number of plants in various stages of growth" (id. ¶ 14); and

c. overheard defendant utilizing a cellular telephone to conduct a "marijuana transaction." (id. ¶ 16.)

**FOF 7.**        CS 1 told Piccini that defendant was involved in the distribution of heroin and fentanyl and CS 1 observed inside 321 Fifth Avenue "packaging supplies utilized in the processing of heroin/fentanyl for distribution." (ECF No. 43-6 ¶¶ 13, 15.)

**FOF 8.**        According to CS 1: (a) inside 321 Fifth Avenue were "several more rooms identical" to the room depicted in the photograph attached to the affidavit of probable cause and "other rooms dedicated to the drying and processing of the marijuana plants" (id. ¶ 14); and (b) defendant "would most likely not keep the proceeds garnered from illegal drug sales at the location of…[defendant's] illegal drugs, i.e., [321 Fifth Avenue]" (id. ¶ 17).

**FOF 9.**        CS 1 informed Piccini that defendant drove a 2006 Nissan Frontier. (Id. ¶ 18.) Piccini learned that defendant's vehicle, i.e., a 2006 Nissan Frontier, was registered to Julia T. George at the address of defendant's residence. (Id.)

**FOF 10.**      At some point prior to authoring the affidavit of probable cause, Piccini relied upon a second confidential source, i.e., "CS 2," who was cooperating for monetary gain and was previously convicted of felony drug trafficking. (ECF No. 43-6 ¶ 26.) CS 2 was previously charged with providing false information to law enforcement. (Id.) CS 2 previously provided to law enforcement "reliable and credible information that…led to large scale drug seizures as well as a Federal arrest and conviction." (Id.)

**FOF 11.**     CS 2 told FBI agents that defendant owned 321 Fifth Avenue, (H.T. 11/29/2018 (ECF No. 54) at 29), and was involved in the "distribution of marijuana and heroin for numerous years," (ECF No. 43-6 ¶ 27.)

**FOF 12.**     Piccini in the affidavit of probable cause, however, wrote that CS 2 owned 321 Fifth Avenue. (ECF No. 43-6 ¶ 27.)

**FOF 13.**     Piccini testified at the hearing on the motion to suppress that identifying CS 2 as the owner of 321 Fifth Avenue in the affidavit of probable cause was a typographical error. (H.T. 11/29/2018 (ECF No. 54) at 29.)

**FOF 14.**     At some point after Piccini authored the affidavit of probable cause he learned that "Pesade Gergamandu"[4] owned the McKeesport Building. (Id. at 40.)

### C.  Piccini's Surveillance of Defendant

**FOF 15.**     On November 1, 2017, FBI agents conducted surveillance of defendant. (ECF No. 43-6 ¶ 19.)

**FOF 16.**     At approximately 9:12 a.m., defendant's vehicle was parked at his residence. (Id. ¶ 20.)

**FOF 17.**      At approximately 9:20 a.m., defendant exited his residence carrying a black gym bag, he placed the gym bag into his vehicle, and he reentered his residence. (Id. ¶ 21.)

**FOF 18.**      At approximately 12:30 p.m., defendant exited his residence and began to drive his vehicle. (Id. ¶ 22.) FBI agents followed defendant. (Id.)

---

[4]     The court refers to "Pesade Gergamandu" in quotations because the spelling of his name was phonetically spelled in the transcript of the November 29, 2018 hearing. (H.T. 11/29/2018 (ECF No. 54) at 40.)

**FOF 19.**     At approximately 1:12 p.m., defendant exited his vehicle and entered Scott Electric. (ECF No. 43-6 ¶ 23.) Defendant exited Scott Electric carrying what appeared to be a receipt. Defendant departed the area in his vehicle. (Id. ¶ 24.)

**FOF 20.**     At approximately 2:22 p.m., defendant parked his vehicle near his residence and was observed standing across the street from his residence. (ECF No. 43-6 ¶ 25.)

**FOF 21.**     In the evening of November 12, 2017 (the day before Piccini applied for and was issued the four search warrants), Piccini conducted surveillance of defendant. (H.T. 11/29/2018 (ECF No. 54) at 12.)

**FOF 22.**     Piccini first went to defendant's residence. He observed that defendant's vehicle was not parked in the location in which defendant "normally" parked his vehicle. (Id. at 12-13.)

**FOF 23.**     Piccini next traveled to the McKeesport Building. (Id. at 13.) He observed "an individual fitting the description of [defendant]" exit the door of the McKeesport Building labeled "321,"[5] walk to defendant's vehicle, and enter the vehicle. (Id.)

**FOF 24.**     Piccini in a vehicle followed defendant in his vehicle. Piccini eventually "for a brief minute" lost sight of defendant's vehicle. Piccini traveled to defendant's residence where he observed defendant's vehicle parked. (Id.)

### D.  Piccini's Application for the Four Search Warrants

**FOF 25.**     On November 13, 2017, law enforcement relying upon one affidavit of probable cause authored by Piccini (ECF No. 46-3) applied for four separate search warrants

---

[5]     Piccini testified that CS 1 told him that he saw defendant exit the same door of the McKeesport Building. (H.T. 11/29/2019 (ECF No. 54) at 16.)

to search: (a) 321 Fifth Avenue; (b) defendant's vehicle; (c) defendant's residence; and (d) defendant's person. (ECF Nos. 43-1-43-4.)

**FOF 26.**     On the same day, a federal magistrate judge signed and issued each of the four search warrants. (ECF Nos. 43-1 at 1; 43-2 at 1, 43-3 at 1, 43-4 at 1.)

**FOF 27.**     Piccini in the affidavit of probable cause provided his relevant training and experience. At the time Piccini authored the affidavit of probable cause, he had approximately fourteen years of experience with the FBI and an "extensive breadth of experience and knowledge about illegal drug trafficking in the Western District of Pennsylvania." (ECF No. 43-6 ¶¶ 2-3.)

**FOF 28.**     Piccini was "aware of the ways in which cocaine, crack cocaine, heroin, marijuana and other drugs are distributed" and that drug traffickers "regularly" own and possess on their persons, in their residences, or in their motor vehicles firearms and other dangerous weapons. (Id. ¶¶ 7-8.) Piccini was "familiar with financial investigations involving proceeds from drug trafficker's [sic] illegal activities." (Id. at 7.)

**FOF 29.**     Based upon Piccini's training and experience, he was aware of the following:

> [i]ndividuals who traffic in drugs and/or commit money-laundering offenses must keep on hand large amounts of United States currency in order to maintain and finance their ongoing business[;]
> …
> [i]ndividuals who traffic in drugs and/or commit money laundering offenses often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the ordering, sale, and distribution of their product where they can have ready access to them. This record keeping also extends to cellular devices and other electronic mediums where drug traffickers will create and maintain records of criminal activity[;]
> …
> [i]ndividuals who traffic in drugs and/or commit money laundering offenses conceal in their residences or place of business large amounts of currency,

7

financial instruments, precious metals, jewelry, and other items of value and/or proceeds of the laundering transactions, and evidence of financial transactions relating obtaining, transferring, secreting, or the spending of large sums of cash derived from engaging in laundering activities[;] and

…

[i]ndividuals who traffic in drugs and/or commit money-laundering offenses often have in their residences or places of business, firearms and other dangerous weapons. These weapons are used to protect and secure property, which may include, but is not limited to, jewelry, books, records, United States currency, real estate property, personal property, etc.

(ECF No. 43-6 ¶¶ 9(c), (d), (e), and (k).)

**FOF 30.** Piccini in the affidavit of probable cause set forth the information obtained via the surveillance of defendant and information about defendant provided by CS 1 and CS 2.

**FOF 31.** Piccini in the affidavit of probable cause explained that CS 1 and CS 2 had felony convictions, and CS 2 was convicted of providing false information to law enforcement. (Id. ¶¶ 12, 26.) The affidavit of probable cause also provided that: (a) CS 1 provided information verified by law enforcement and which led to "multiple narcotics seizures and two Federal Search Warrants" (Id. ¶ 12); and (b) CS 2 provided "reliable and credible" information that led to large scale drug seizures and a federal conviction. (Id. ¶ 26)

**FOF 32.** Piccini in the affidavit of probable cause summarized the information received from CS 1 and CS as follows:

CS 1 and CS 2 both identify…[defendant] as a marijuana distributor. Further, they both connect…[defendant] to being the owner or individual utilizing…[321 Fifth Avenue]. The photograph provided by CS 1 indicates that…[321 Fifth Avenue] is being utilized by…[defendant] to grow and process marijuana for distribution. CS 1 and CS 2 both identify…[defendant] as either a heroin or fentanyl distributor. CS 1 observed heroin/fentanyl packing items at…[321 Fifth Avenue]. In addition, surveillance conducted by the FCI corroborates…[defendant's] connection to…[321 Fifth Avenue].

…

CS 1 identified…[defendant's] vehicle…and surveillance corroborated CS 1's information. Furthermore, PA DMV registration of…[defendant's vehicle] linked…[defendant's vehicle] to…[defendant's residence]. Surveillance units observed…[defendant's vehicle] at…[defendant's residence] and further observed….[defendant] exit…[defendant's residence] and depart the area in…[defendant's vehicle]. Significantly, agents observed…[defendant] carry a black gym bag from…[defendant's residence] and place it into..[defendant's vehicle] before departing the area in…[defendant's vehicle]. Additionally agents observed…[defendant] utilizing…[defendant's vehicle] to travel to Scott Electric in Lawrenceville.

(<u>Id.</u> ¶¶ 28-29.)

**FOF 33.** Piccini attached to the affidavit of probable cause: (a) a photograph of the front of the McKeesport Building (ECF No. 43-6 at 13); the photograph provided by CS 1 (<u>id.</u> at 18), which "depicts a complex marijuana grow operation with a lighting system" and "a significant number of plants in various stages of growth," and a photograph of defendant's residence (<u>id.</u> ¶ 14).

**FOF 34.** Piccini in the affidavit of probable cause explained that it was "likely" that defendant had evidence of his illegal grow operation in his vehicle because: (a) defendant used a lighting system and electrical supplies in his grow operation; and (b) defendant used his vehicle in furtherance of the illegal grow operation by traveling in his vehicle to Scott Electric, making a purchase in the store, and returning to his vehicle. (ECF No. 43-6 ¶¶ 29-30.)

**FOF 35.** Piccini in the affidavit of probable cause concluded that it was "probable" that defendant would have evidence of his illegal drug trafficking activities on his person because: (a) CS 1 overheard defendant conducting a drug transaction via defendant's cellular telephone; and (b) "drug traffickers maintain contact information of their suppliers as well as their customers on their cellular telephone(s)…[and] on their person." (<u>Id.</u> ¶ 32.)

**FOF 36.**    Piccini in the affidavit of probable cause also concluded that it was "probable" that defendant stored "proceeds and other illegal items related to drug trafficking" at his residence. (ECF No. 43-6 ¶ 31.) Piccini explained that "large scale illegal drug traffickers prefer not to have large sums of money where their illegal drugs are located for fear of being robbed and to thwart law enforcement." (<u>Id.</u>) For the same reasons, "it is common for drug dealers not [to] store all…their illegal drugs, paraphernalia and owe sheets in one location." (<u>Id.</u>)

### E.  The Execution of the Search Warrant at the McKeesport Building

**FOF 37.**    Piccini was not "on-site for the [initial] execution of the search warrant" for 321 Fifth Avenue at the McKeesport Building; rather, at that time he was in transit from defendant's residence to the McKeesport Building. (H.T. 11/29/2018 (ECF No. 54) at 16.)

**FOF 38.**    While at defendant's residence, Piccini obtained keys from defendant's person. (<u>Id.</u>) Piccini provided those keys to another special agent who transported the keys to the McKeesport Building. (<u>Id.</u>) The agents on-scene at the McKeesport Building used the keys to open the door labeled "321" to the McKeesport Building. (<u>Id.</u> at 16-17.)

**FOF 39.**    Piccini arrived at the McKeesport Building "after the initial clearing of the building" had taken place.[6] (<u>Id.</u> at 16.) Piccini upon his arrival did a "walk-through…while evidence was being collected." (H.T. 11/29/2018 (ECF No. 54) at 16.)

---

[6]    Piccini explained the potential danger presented to law enforcement by items found on the second floor of 321 Fifth Avenue:

> Well, at that time, it was commonplace to do the walk-through. The main concern was mitigating hazards. I wasn't concerned about the collection of evidence at that time. It was how to collect it safely due to the high, the electrical box that they [were] using, storing energy, and people getting electrocuted. Plus the open, what appeared to be heroin packaging, fentanyl packing. And the smell was very strong.

**FOF 40.**     Piccini entered the McKeesport Building via the door marked "321 Fifth." (Id.)

**FOF 41.**     Piccini upon walking through the door marked "321 Fifth" observed three mailboxes with "some other numbers on [them]." (H.T. 11/29/2018 (ECF No. 54) at 33.)

**FOF 42.**     Piccini described what he saw when he entered the McKeesport Building via the door marked "321:"

> When you walk through that door, I believe it opens up. On the left-hand side is a small room. I don't recall a door on it, but it may have been a reception area at one time.
>
> …
>
> [D]ownstairs was pretty much barren. Then you continue forward and there was a direct opening all the way to the back of the building. But there was a, an area to the right which was cubed off, maybe office type space. I remember there being an open or some type of safe that probably went to the building at one time. And as you just continued back to the back wall of the building, there was a door that was opened right there and that just takes you right up the steps. You go up the steps and can access the second floor.

(H.T. 11/29/2018 (ECF No. 54) at 17.)

**FOF 43.**     Piccini observed walls in the first floor of 321 Fifth Avenue. (H.T. 11/29/2018 (ECF No. 54) at 37.)

**FOF 44.**     Piccini believed as he walked through the McKeesport Building that he was walking through "321 Fifth Avenue." (H.T. 11/29/2018 (ECF No. 54) at 25.)

**FOF 45.**     Piccini when asked about the door that accessed the stairs to the second floor, responded: "That door is direct, when I come through 321, if I continue straight, I walk right to the door back there." (Id. at 17-18.) He explained: "I believe if you were to open the

---

So, that's why I was talking with the clandestine lab at that time.

(H.T. 11/29/2018 (ECF No. 54) at 26.)

front door of 321 Fifth, while standing on the street, you could look directly to the back wall of the building….If I walked straight back and ran right into that wall, I could open the door with my left hand [sic] it was right there." (Id. at 18.)

**FOF 46.** There was a "key chain and a lock" on the door on the first floor that led to the stairs to the second floor. (Id. at 38.) The door on the first floor, however, was not secured. (Id.)

**FOF 47.** Piccini described what he observed on the second floor of 321 Fifth Avenue as follows:

> When you walk out on the second floor, there was a large rectangular space and in that space was piles of equipment, tools, tons of clutter, all, and all types of materials utilized for the production and growth of marijuana plants. Right there. The, the smell [of marijuana] was emanating. It was tremendous. You could smell it even from the first floor up to the second floor.
> 
> …
> 
> So, in that rectangle, which was an open spot, was very cluttered with these types of items. If I turned myself a little bit to the right, there was a room there with lights on, like growth-type lights, and marijuana plants visible from that point.
> 
> And if you walked into that room, there was numerous plants growth, water, all kinds of the type of things you would grow plants with. And that was the main area that you would see if you walked off of [sic] onto the second floor from those steps.
> 
> That center room that I just described with the marijuana plants on the right side of it and on the left side of it, there were hallways that walked back and which would open into rooms. This hallway that goes straight back would open into rooms, would open into rooms. And if you walked down those hallways, the right side, there were large thermal-type tents with marijuana grow type set-ups in them. If you walked down the left-hand side hallway, there was a grow room and there was a room that was predominantly in plain view we found heroin packaging items. Some stamp bags, cutting utensils, white powder, on a desk there. And, so that was kind of, it was all centered, like centered like this as you walked off of those steps onto, in that area.

(H.T. 11/29/2018 (ECF No. 54) at 18-19.)

**FOF 48.**     Piccini emphasized the size of the room he encountered as he walked from the stairs onto the second floor:

> The space I'm describing is a very large space, Judge. It's a very big space. I recall three specific grow rooms. I recall one room being prepared to be made into a grow room. I don't recall locating any evidence outside of the rooms on those five hallways that went down there. I don't recall that.

(Id. at 20.)

**FOF 49.**     All the windows on the second floor of the McKeesport Building had black film on them. (Id. at 20.)

**FOF 50.**     There were no barriers on the second floor, i.e., it was one space. (Id. at 21.) In other words, Piccini could walk across the entire second floor. (Id.)

**FOF 51.**     Piccini on the second floor "pictured…[himself] in one recently occupied section of…[the McKeesport Building]." (H.T. 11/29/2018 (ECF No. 54) at 44.)

**FOF 52.**     During Piccini's walkthrough of 321 Fifth Avenue, he recovered documents containing defendant's name. (Id. at 25.) He walked through the entire second floor prior to "looking through those documents." (Id. at 26.)

**FOF 53.**     Piccini did not know which parts, if any, of the second floor of the McKeesport Building were part of "315 Fifth Avenue" or "317 Fifth Avenue." (H.T. 11/29/2018 (ECF No. 54) at 37.)

**FOF 54.**     Piccini explained:

> Taking into the effect that my other source information was that the building was owned by Mr. Rice. That I was, no matter where I went, I was under the interpretation I was in 321.
>
> I'm from the McKeesport area. I'm familiar with those buildings down there. Before they were, I think, were subdivided into whatever they were ten years ago, five years ago, whatever, that was one unit down there. One whole office building. So, as it evolved and what it became in the future, that didn't really go

into my thought process of going into 321 because it all looked abandoned from the first floor to me.

…

I viewed whether the first, second, or third floor, all to be within the scope of what I was writing for considering I had seen Mr. Rice come out of 321. So, whatever Mr. Rice could access from going into 321, I viewed as the scope of my search.

…

I never viewed it as any other address [than 321 Fifth Avenue].

(H.T. 11/29/2018 (ECF No. 54) at 44-45.)

### III.    CONCLUSIONS OF LAW

**COL 1.**    The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause…."  U.S. CONST. AMEND. IV.

**COL 2.**    Defendant argues that the evidence obtained pursuant to three of the search warrants issued by the magistrate judge should be suppressed because the evidence was obtained in violation of his Fourth Amendment rights.

**COL 3.**    Defendant's constitutional challenges, the government's responses, and the applicable law will be addressed below.

### A. <u>Defendant's Lack of Standing to Challenge the Search Warrant for the McKeesport Building</u>

**COL 4.**    Defendant challenges the constitutionality of the search of the McKeesport Building. The government argues, however, that defendant did not satisfy his burden to show that he has *standing* to challenge the search of the area of the McKeesport Building that was searched by law enforcement and from which contraband was recovered.[7]

---

[7]    The government also argued that defendant could not have standing to challenge the

**COL 5.**     "To invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure." United States v. Stern, 597 F.3d 540, 551 (3d Cir. 2010).

**COL 6.**     The Third Circuit Court of Appeals in Stern explained:

> Because Fourth Amendment rights are "personal," id. at 139, 99 S.Ct. 421, the proponent of a motion to suppress "bears the burden of proving not only that the search ... was illegal, but also that he had a legitimate expectation of privacy in [the place searched]." Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). "The 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." Mosley, 454 F.3d at 253 n. 5.

Id.

**COL 7.**     "Standing to challenge a search requires that the individual challenging the search have a reasonable expectation[8] of privacy in the property searched,…and that he

---

search of the McKeesport Building because it was an *abandoned* building. Defendant did not satisfy his burden to show that he had standing to challenge the search of the McKeesport Building even if it was not abandoned. Under those circumstances, the court need not address the government's abandonment argument.

8     The Supreme Court has explained:

> Obviously, however, a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence, in the words of Jones, 362 U.S., at 267, 80 S.Ct., at 734, is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.' " Katz v. United States, 389 U.S., at 361, 88 S.Ct., at 516 (Harlan, J., concurring). And it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases. Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.

Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978).

manifest a subjective expectation of privacy in the property searched….” United States v. Baker, 221 F.3d 438, 441 (3d Cir. 2000) (internal citations omitted).

     **COL 8.**     “Regarding the objective prong, ‘we inquire whether the individual's expectation of privacy is ‘one that society is prepared to recognize as reasonable.’” United States v. Correa, 653 F.3d 187, 190 (3d Cir. 2011) (quoting Bond v. United States, 529 U.S. 334, 338 (2000)).

     **COL 9.**     “Regarding the subjective prong, ‘we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that ‘he [sought] to preserve [something] as private.’” Correa, 653 U.S. at 190 (quoting Bond, 529 U.S. at 338).

     **COL 10.**     Here, defendant presented evidence to show that the McKeesport Building had three mailing addresses: (a) 315 Fifth Avenue; (b) 317 Fifth Avenue; and (c) 321 Fifth Avenue.

     **COL 11.**     Defendant at the hearing on the on the motion to suppress conceded that he does not have standing to challenge a search of 321 Fifth Avenue. (H.T. 11/29/2018 (ECF No. 54) at 51.)

     **COL 12.**     Defendant’s counsel argued that the government did not prove that the area searched by law enforcement was 321 Fifth Avenue as opposed to 315 or 317 Fifth Avenue. (Id. at 50-51.)

     **COL 13.**     Defendant’s argument is not convincing.  It is defendant’s burden to show that he has standing to challenge the “property searched,” and all the evidence presented in this case shows that the “property searched” by Piccini and other members of law enforcement was “321 Fifth Avenue.”

COL 14.    For example, Piccini in the affidavit of probable cause identified the property to be searched as "321 Fifth Avenue." Piccini explained that he identified the place to be search as "321 Fifth Avenue" based upon information received from CS 1 that defendant ran the illegal marijuana grow operation in "321 Fifth Avenue" and Piccini's observations that defendant entered the McKeesport Building via the door labeled "321."

COL 15.    Piccini testified that on the day of the search he entered the McKeesport Building via the door labeled "321 Fifth," encountered a "barren" first floor, accessed a stairwell via an unsecured door, and walked (without encountering barriers) onto the second floor. Piccini explained that his entry onto the second floor provided him access to all hallways and rooms in which the illegal grow operation and other contraband were found.

COL 16.    Defendant did not present any evidence to show that the areas searched by law enforcement were a part of 315 or 317 Fifth Avenue. Defendant's counsel referred to utility bills for 315 Fifth Avenue that were in defendant's name, but did not present any evidence to show that the property searched was 315 Fifth Avenue or 317 Fifth Avenue as opposed to 321 Fifth Avenue. (H.T. 11/29/2018 (ECF No. 54) at 6.)

COL 17.    Under those circumstances, defendant did not satisfy his burden to show he had an objectively reasonable expectation of privacy or subjective expectation of privacy in the "property searched," i.e., 321 Fifth Avenue; rather, he conceded that he does not have standing to challenge a search of that property.

COL 18.    Defendant's motion to suppress will be denied for lack of standing with respect to his challenges to the search of the McKeesport Building, i.e., 321 Fifth Avenue.

B. **The Magistrate Judge's Finding that there was a Fair Probability that Defendant's Residence and his Person Contained Contraband**

**COL 19.**     Defendant argues that the affidavit of probable cause relied upon to obtain the search warrants does not support a finding of probable cause to search defendant's residence or his person. He explains that the warrant does not show that he was involved in any criminal activity.

**COL 20.**     Because defendant's residence and his person were searched pursuant to search warrants issued by a federal magistrate judge, the court must only determine whether the magistrate judge had a "'substantial basis for… conclud[ing]' that probable cause existed.'" United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

**COL 21.**     The Third Circuit Court of Appeals has explained:

> This standard "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." United States v. Tehfe, 722 F.2d 1114, 1117 (3d Cir.1983), cert. denied sub nom., Sanchez v. United States, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984). Nevertheless, the role of the reviewing court is quite limited. The Supreme Court has directed that "although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) (emphasis added), quoted with approval in Gates, 462 U.S. at 237 n. 10, 103 S.Ct. at 2331 n. 10.

Conley, 4 F.3d at 1205.

**COL 22.**     "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubbs, 547 U.S. 90, 96 (2006) (quoting Gates, 462 U.S. at 238). Probable cause determinations require the magistrate judge to make a "practical, common-sense decision." Gates, 462 U.S. at 238. "The supporting affidavit must be read in its entirety and in a common sense and nontechnical manner." Conley, 4 F.3d at 1206 (citing Gates, 462 U.S. at 230–31).

**COL 23.**     With respect to a magistrate judge's reliance upon an affidavit of probable cause based upon confidential sources, one court has explained:

> When relying on statements made by an unnamed source, the affiant must do more than attest to having received "reliable information from a credible person." Id. (quoting Aguilar v. Texas, 378 U.S. 108, 109, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)). Corroboration of a source's statements will support a finding of probable cause. As the Gates Court indicated: "Our decisions applying the totality-of-the-circumstances analysis ... have consistently recognized the value of corroboration of details of an informant's tip by independent police work." Id. at 241. [I]t is enough for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.' " Id. at 244-45 (quoting Jones, 362 U.S. at 269, 271).

United States v. Tucker, Crim. Action No. 05-440-10, 2008 WL 304897, at *2 (E.D. Pa. Feb. 1, 2008).

**COL 24.**     The court in Tucker relied upon the information provided to law enforcement from confidential informants because the confidential informants "had personal knowledge of the [d]efendant's criminal activities" and law enforcement "independently verified much of the information provided by the confidential sources." Id. The court specifically noted that one of the confidential informants had been inside the defendant's home, which was "the home named in the warrant." Id. The court explained that the corroboration by law enforcement showed that the confidential informants were not unreliable. Id. at *2-3.

**COL 25.**     Here, the magistrate judge had a substantial basis upon which to conclude there was a fair probability that contraband or evidence of a crime would be found[9]

---

[9]     If defendant had standing to challenge the search of 321 Fifth Avenue, the court would conclude that for the reasons set forth in this section of the opinion that the magistrate judge had a substantial basis upon which to conclude there was a fair probability that evidence of

in defendant's residence, and on his person. The affidavit of probable cause showed that: (1) defendant was conducting illegal activity inside 321 Fifth Avenue; and (2) evidence of that illegal activity would likely be found in defendant's residence and on his person.

**COL 26.** The affidavit of probable cause dated November 13, 2017, provided, among other things, that:

(a) CS 1 told law enforcement that defendant was growing marijuana inside 321 Fifth Avenue;

(b) CS 1 provided law enforcement a photograph taken in late October 2017, which depicted one of the rooms inside 321 Fifth Avenue in which marijuana was being grown;

(c) CS 1 told law enforcement that he previously overheard defendant conducting a marijuana transaction via cellular telephone; and

(d) CS 2 told law enforcement that defendant had been involved in the distribution of marijuana for numerous years.

**COL 27.** CS 1 and CS 2 were verified by law enforcement and previously provided information that lead to the discovery of narcotics, other federal search warrants, and a federal arrest and conviction. Some of the information provided by the confidential informants was corroborated by law enforcement observations, e.g., CS 1 identified the 2006 Nissan Frontier as defendant's vehicle and law enforcement observed defendant driving that vehicle, parking it at his residence, and that it was registered to defendant's residence. (ECF No. 43-6 ¶ 29.)

**COL 28.** A photograph taken by CS 1 was attached to the search warrant application made on November 13, 2017, for the magistrate judge's review. The affidavit of probable cause provided that the photograph was taken in late October 2017 and displayed

---

defendant's illegal drug activity was taking place in 321 Fifth Avenue.

marijuana plants in various stages of growth. The search warrant was executed on November 14, 2017, i.e., approximately 2 to 3 weeks after the photograph depicting marijuana plants in various stages of growth was taken.

**COL 29.**    Based upon the foregoing, the magistrate judge had a substantial basis upon which to conclude that there was a fair probability that on November 14, 2017, evidence that marijuana was being grown by defendant existed in 321 Fifth Avenue.

**COL 30.**    The affidavit of probable cause also provided the magistrate judge a substantial basis upon which to conclude that evidence of defendant's illegal activities (the marijuana grow operation) would likely be found in his residence and on his person.

**COL 31.**    The affidavit of probable cause provided that based upon Piccini's training and experience, "[i]ndividuals who traffic in drugs[:]" (a) "must keep on hand large amounts of United States currency in order to maintain and finance their ongoing business" (ECF No. 43-6 ¶ 9(c)); (b) "often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the ordering, sale, and distribution of their product where they can have ready access to them" (id. ¶ 9(d)); (c) "conceal in their residences…large amounts of currency" (id. ¶ 9(e)); and (d) "often have in their residences…firearms and other dangerous weapons…." (id. ¶ 9(k).)

**COL 32.**    The affidavit of probable cause also provides that CS 1 informed law enforcement that defendant would "most likely…not keep proceeds from illegal drug transactions at…[321 Fifth Avenue]." (ECF No. 43-6 ¶ 31.) Piccini corroborated the information provided by CS 1 and explained: "large scale illegal drug traffickers prefer not to have large sums of money where their illegal drugs are located for fear of being robbed and to

thwart law enforcement." (Id.) Piccini concluded that it was, therefore, probable that defendant had evidence such as "owe sheets" at his residence. (Id.)

**COL 33.**     Piccini in the affidavit explained that based upon his training and experience it was likely that defendant had evidence of his illegal drug activity on his person because CS 1 overheard defendant conducting a drug transaction on a cellular telephone and "drug traffickers maintain contact information of their suppliers as well as their customers on their cellular telephone(s) as well as on their person." (ECF No. 43-6 ¶ 32.)

**COL 34.**     Based upon the foregoing, the affidavit of probable cause provided the magistrate judge a substantial basis upon which to conclude there was a fair probability that evidence of defendant's illegal marijuana grow operation and drug trafficking activity would be found in defendant's residence and on his person.

**COL 35.**     The motion to suppress will, therefore, be denied with respect to defendant's argument that the affidavit of probable cause did not provide the magistrate judge a substantial basis upon which to conclude that there was a fair probability evidence of defendant's illegal drug activity would be found in his residence and on his person.

### C. **Whether Defendant is Entitled to a Franks Hearing**

**COL 36.**     Defendant argues that Piccini's affidavit of probable cause is "facially deficient, inaccurate, mislead [sic] and does not provide probable cause to search to search 321 Fifth Avenue…." (ECF No. 43 at 4.) Defendant explains that the affidavit did not provide information about the McKeesport Building being a three-story, multi-unit building with three

different addresses, as opposed to being one building with the address of 321 Fifth Avenue.[10]

(Id. at 2-4.)

      **COL 37.**      The government interprets defendant's argument as an argument about the particularity[11] of the search warrant, and argues that the properly characterized argument is that law enforcement overstepped their boundaries when executing the search warrant, i.e.,

---

[10]     Although defendant does not have standing to challenge a search of 321 Fifth Avenue, Piccini's description of 321 Fifth Avenue is relevant to the magistrate judge's determination about whether there was probable cause to search defendant's residence and his person. Piccini in the affidavit of probable cause identified the illegal activity of defendant as the illegal trafficking of drugs, including the operation of the marijuana grow facility inside 321 Fifth Avenue, and concluded there was probable cause that evidence of those crimes would be found on defendant's person and in his residence. (ECF No. 43-6 ¶¶ 30-32.)

[11]     The Fourth Amendment to the United States Constitution directs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched and the person or things to be seized*." U.S. CONST. AMEND. IV (emphasis added). The particularity requirement of the Fourth Amendment functions as a prohibition of overbroad general warrants which "essentially authorize 'a general exploratory rummaging in a person's belongings.'" United States v. Yusuf, 461 F.3d 374, 393 (3d Cir.2006) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)); accord United States v. Leveto, 540 F.3d 200, (3d Cir. 2008) ("A warrant is not general unless it can be said to vest the executing officer with unbridled discretion to conduct an exploratory rummaging through defendant's papers in search of criminal evidence." (internal quotations omitted)). To determine if a warrant was overbroad, the court "must compare the scope of the search and seizure authorized by the warrant with the ambit of probable cause established by the supporting affidavit." In re Impounded Case (Law Firm), 840 F.2d 196, 200 (3d Cir. 1988).
     Here, the search warrant for 321 Fifth Avenue was not overbroad. The affidavit of probable cause provided that—based upon information from CS 1 and CS 2 and Piccini's observations, training, and experience—defendant was growing marijuana in 321 Fifth Avenue. The affidavit of probable cause also set forth the specific items that law enforcement intended to seize from that location. The affidavit of probable cause also was sufficiently particular with respect to defendant's residence and person and the items to be seized from those locations. Thus, the particularity of the search warrants is not in issue this case. Defendant argues, however, that Piccini provided a falsity in the affidavit, i.e., the McKeesport Building had only one address of 321 Fifth Avenue, and he omitted an accurate description of the property. Those issues are best addressed under Franks.

the only had permission to search 321 Fifth Avenue but also searched 315 and 317 Fifth Avenue. (ECF No. 45 at 7.)

**COL 38.** Defendant's argument that law enforcement recklessly omitted information from the affidavit or included misleading or inaccurate information in the affidavit that would have impacted the magistrate judge's determination of probable cause, however, is best addressed under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

**COL 39.** Under <u>Franks</u>, when a warrant is obtained based upon a false statement made in a supporting affidavit, the fruits of the search warrant must be excluded if the remaining material, following the excision of the falsity, is independently insufficient to support a finding of probable cause. <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 402 (3d Cir.1997). If the falsity is based upon an omission rather than a misstatement of facts, the court must remove the falsehood by supplying the omitted information to the original affidavit, and subsequently determining if the affidavit with the added information contains sufficient probable cause. <u>Id.</u> at 399.

**COL 40.** In order to obtain a <u>Franks</u> hearing, the defendant[12] must first make a "substantial preliminary showing" that (a) the affidavit contained a false statement, which was

---

[12]     The Supreme Court explained the government's burden as follows:

There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose

made knowingly or with reckless disregard for the truth, and (b) the false statement is material to the finding of probable cause. <u>Yusuf</u>, 461 F.3d 374, 383.

**COL 41.** If that showing is made, and a hearing is granted, defendant must prove by a preponderance of the evidence that: (a) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (b) such statements or omissions were material, or necessary, to the probable cause determination. <u>Id.</u>

**COL 42.** To determine whether deficiencies in the affidavit are "material," the court must follow the following procedure:

> When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit."

<u>Id.</u> at 384 (quoting <u>Sherwood</u>, 113 F.3d at 400). If probable cause still exists after the affidavit has been "corrected," then the deficiencies are not material. <u>Id.</u>

**COL 43.** To make a substantial preliminary showing, defendant must present more than conclusory statements or arguments. <u>Id.</u> at 383 n. 8 ("In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a 'mere desire to cross-examine,' but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.").

---

impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.

<u>Franks</u>, 438 U.S. at 171-72.

**COL 44.** The Court of Appeals for the Third Circuit has explained the "substantial preliminary showing" required by the defendant as follows:

> To obtain a <u>Franks</u> hearing, the defendant must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause."…To meet this threshold, a challenger must present more than conclusory statements that the affidavit contains false statements or omissions.…The challenger must specifically identify allegedly false statements or omissions in the affidavit and provide a statement of reasons supporting the argument.…The challenger must also provide an offer of proof or give a satisfactory explanation for the absence of proof.…Sworn affidavits or reliable statements from witnesses are examples of offers of proof sufficient to satisfy the substantial preliminary showing…. When demonstrating that the affiant omitted a material fact or included a false statement with the requisite mens rea, it is insufficient to prove the affiant acted with negligence or made an innocent mistake.…If the challenger provides sufficient proof and obtains a <u>Franks</u> hearing, the challenger must prove by a preponderance that (1) the affiant made false statements or omissions intentionally, knowingly, or with reckless disregard for the truth, and (2) such statements were material to the probable cause determination.…If the challenger satisfies this burden, we will excise the false statements and omissions from the affidavit and assess whether the corrected affidavit establishes probable cause.

<u>United States v. Heilman</u>, 377 F. App'x 157, 177 (3d Cir. 2010) (citations omitted).

**COL 45.** Here, defendant identifies the following inaccuracies in or omissions from the affidavit:

(a) the building to be searched is inaccurately described because it is not a single unit building; rather, it is a three-story building consisting of three separate units;

(b) the affidavit does not provide that the building has multiple entrances and exits;

(c) there are "separate and multiple" access points to the second and third floors of the McKeesport Building;

(d) the government requested only to search 321 Fifth Avenue and not 315 or 317 Fifth Avenue;

(e) the affidavit provides the owner of the building is CS 2 and does not identify the true owner; and

(f) there is no information about who leased the property.

(ECF No. 43 at 2.)

**COL 46.**    Defendant's argument that the foregoing omissions and inaccuracies are *material* to the magistrate judge's determination of probable cause is based upon defendant's contention that the government did not prove that the search of the McKeesport Building was limited to 321 Fifth Avenue for which Piccini obtained a search warrant. As discussed above, however, the evidence presented shows that areas of the McKeesport Building that were searched by law enforcement were more likely than not all part of 321 Fifth Avenue for which Piccini obtained a search warrant.

**COL 47.**    CS 1 told law enforcement that defendant used 321 Fifth Avenue for his illegal marijuana grow operation; indeed, CS 1 provided to FBI agents a photograph of the illegal grow operation inside the building. CS 2 told law enforcement that defendant was involved in the distribution of marijuana for numerous years. Thus, even if Piccini in the affidavit *accurately* described the McKeesport Building as consisting of three separate units with multiple entrances, exits, and access points to the second and third floors and provided the names of the (actual) owner and lessee of the building, there would be probable cause to issue a search warrant for 321 Fifth Avenue, the unit in which CS 1 stated that defendant maintained the illegal operation.

**COL 48.**    Under those circumstances, the alleged omissions and inaccuracies cited by defendant are not material to the magistrate judge's determination of probable cause based

upon Piccini's affidavit. Defendant is not, therefore, entitled to a <u>Franks</u> hearing and his motion to suppress will be denied with respect to this issue.[13]

### D. <u>Whether the Good Faith Exception Applies to Law Enforcement's Search of the McKeesport Building, Defendant's Residence, or Defendant's Person</u>

**COL 49.** The good faith exception would apply to law enforcement's search of the McKeesport Building, defendant's residence, and defendant's person even if: (1) defendant had standing to challenge the search of 321 Fifth Avenue; and (2) the magistrate judge upon reviewing Piccini's affidavit did not have a substantial basis upon which to conclude there was a fair probability that evidence of defendant's illegal drug activity would be found in 321 Fifth Avenue, in defendant's residence, and on defendant's person.

**COL 50.** "The test for whether the good faith exception applies is 'whether a reasonably well[-]trained officer would have known that the search was illegal despite the magistrate's authorization.'" <u>United States v. Loy</u>, 191 F.3d 360, 367 (3d Cir. 1999) (quoting <u>United States v. Leon</u>, 468 U.S. 897, 922 n.23 (1984)).

**COL 51.** The Third Circuit Court of Appeals has explained:

> The good faith exception instructs that suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." <u>Williams</u>, 3 F.3d at 74. "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate[ judge's] authorization.'

---

[13] Piccini at the hearing on the motion to suppress identified a typographical error with respect to the owner of the McKeesport Building. (H.T. 11/29/2018 (ECF No. 54) at 29.) Piccini wrote in the affidavit that CS 2 was the owner of the building, but testified that CS 2 told him that *defendant* was the owner of the building. (<u>Id.</u>) Defendant did not argue that he was entitled to a <u>Franks</u> hearing with respect to the typographical error. In any event, in light of the information provided by CS 1 and CS 2, excising the typographical error from the affidavit of probable cause would not defeat a finding that there was probable cause to believe that defendant—despite not owning the McKeesport Building—was running an illegal marijuana grow operation inside the McKeesport Building.

" <u>Loy</u>, 191 F.3d at 367 (quoting <u>Leon</u>, 468 U.S. at 922 n. 23, 104 S.Ct. 3405). **The mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception.** <u>Leon</u>, 468 U.S. at 922, 104 S.Ct. 3405; <u>Williams</u>, 3 F.3d at 74.

<u>United States v. Hodge</u>, 246 F.3d 301, 307-08 (3d Cir. 2001) (emphasis added).

**COL 52.**    There are four "narrow" situations in which the good faith exception would not apply to a law enforcement officer's reliance on a warrant:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or
>
> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

<u>Id.</u> at 308; <u>United States v. Stearn</u>, 597 F.3d 540, 561 (3d Cir. 2010).

**COL 53.**    The burden is on the government to show that the food faith exception applies in a case. <u>Leon</u>, 468 U.S. at 924 ("When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time.").

**COL 54.**    Here, the FBI agents relied upon search warrants issued by a magistrate judge to search 321 Fifth Avenue, defendant's residence, and defendant's person. As discussed above, Piccini in the affidavit of probable cause relied upon reliable and verified confidential informants and his own observations, training, experience to conclude there was probable cause to believe that evidence of defendant's illegal drug trafficking activity would be found

in 321 Fifth Avenue, in defendant's residence, and on defendant's person. Thus, Piccini's reliance upon the search warrants issued by the magistrate judge was objectively reasonable and the good faith exception would apply to the searches conducted by law enforcement unless this case falls within one of the four "narrow" circumstances listed above.

**COL 55.** This case does not implicate the second circumstance, i.e., defendant does not argue that the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function.

**COL 56.** This case does not implicate the third circumstance. The court already concluded that Piccini's affidavit of probable cause provided the magistrate judge a sufficient basis upon which to conclude there was a fair probability that evidence of defendant's illegal drug activities would be found in 321 Fifth Avenue, defendant's residence, and on defendant's person. Thus, the court would not conclude that Piccini's affidavit was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" Hodge, 246 F.3d at 308 (quoting United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993)).

**COL 57.** Similarly, the court concluded that the search warrants issued by the magistrate judge were sufficiently particularized, and, therefore, the fourth circumstance is not applicable in this case. In other words, the court would not conclude that the search warrants were "so facially deficient that…[they] failed to particularize the place[s] to be searched or the things to be seized." Id. (quoting Williams, 3 F.3d at 74).

**COL 58.** Defendant argues that Piccini's affidavit "contains a falsity, that the building…[law enforcement] sought to search was not only a three[-]story building with an address of 321 Fifth Avenue, but it was a three[-]story building with three separate

addresses…." (ECF No. 43 at 8.) Thus, the first circumstance, i.e., the magistrate judge relied upon a deliberately false or reckless affidavit, is implicated in this case.

**COL 59.**    There was no evidence presented to show that the inaccuracies in Piccini's affidavit of probable cause were deliberately made. The court will, therefore, consider whether Piccini recklessly made falsities in his affidavit upon which the magistrate judge relied.

**COL 60.**    "In this Circuit, the rule is that '[a]n assertion is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'"  United States v. Brown, 631 F.3d 638, 645 (3d Cir. 2011) (quoting Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000)).

**COL 61.**    The evidence shows that Piccini's description of the McKeesport Building as "a white three[-]story office building" was based upon his reasoned understanding that the McKeesport Building was one parcel with an address of 321 Fifth Avenue. (ECF No. 43-6 at 13.) Piccini testified that the first floor of the McKeesport Building appeared to be abandoned, he knew that the building at one time did not consist of three separate parcels, and the *reliable* confidential informants referred to the building in which defendant operated an illegal grow operation as 321 Fifth Avenue. Under those circumstances, the court cannot conclude that Piccini "'must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" Brown, 631 F.3d at 645 (quoting Wilson, 212 F.3d at 788).

**COL 62.**    There was also evidence presented to show that the affidavit contained a falsity with respect to the owner of the McKeesport Building. Piccini in the affidavit wrote that

CS 2 owned the McKeesport Building. Piccini testified that identifying CS 2 as the owner of the McKeesport Building was a typographical error. Piccini testified that: (a) CS 2 *actually* reported that defendant was the owner of the McKeesport Building; and (b) at some time after authoring the affidavit of probable cause he learned that "Pesade Gergamandu" owned the McKeesport Building. (H.T. 11/29/2018 (ECF No. 54) at 40.)

**COL 63.**     The court cannot conclude, however, that Piccini's typographical error in the affidavit of probable cause was recklessly made or warrants exclusion of the evidence obtained pursuant to the search warrants.

**COL 64.**     First, Piccini credibly testified that identifying CS 2 as the owner of 321 Fifth Street was a typographical error, which sounds in negligence.

**COL 65.**     Excluding the evidence obtained from the execution of the search warrants in this case based upon a typographical error would not further the purpose of the exclusionary rule "to deter police misconduct" that violates a defendant's Fourth Amendment rights. <u>Leon</u>, 468 U.S. at 916.

**COL 66.**     The Supreme Court of the United States in <u>Leon</u> instructed that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those *unusual* cases in which exclusion will further the purposes of the exclusionary rule police misconduct." <u>Id.</u> at 918 (emphasis added).

**COL 67.**     As one court noted: "Police officers, like magistrates, lawyers, and judges make honest proof-reading errors from time to time." <u>United States v. Gary</u>, 420 F.Supp.2d 470 (E.D. Va. 2006). The purpose of the exclusionary rule to deter police misconduct "is not served by suppressing evidence obtained pursuant to a search warrant the

affidavit for which contains an innocent typographical error, *even if that error is singularly dispositive of probable cause*." <u>Id.</u> at 491 (emphasis added).

**COL 68.** Here, the typographical error was not material to the magistrate judge's determination of probable cause. A statement by CS 2 that defendant was the owner of the McKeesport Building would only show that Piccini believed there was a stronger link between defendant and the illegal marijuana grow operation inside 321 Fifth Avenue.

**COL 69.** Even if Piccini identified the actual owner[14] of the McKeesport Building in the affidavit of probable cause, the magistrate judge would have had a substantial basis upon which to conclude there was a fair probability that evidence of defendant's illegal drug activity would be found in the property searched based upon the other information provided by CS 1 and CS 2 and Piccini's observations, training, and experience.

**COL 70.** Based upon the foregoing, the court cannot conclude that Piccini recklessly made falsities in the affidavit of probable cause upon which the magistrate judge

---

[14] Piccini could have conducted a real property search in public records to determine the owner of the McKeesport Building. At the time Piccini authored the affidavit of probable cause, however, he did not know that "Pesade Gergamandu" owned the McKeesport Building and he reasonably believed that CS 2 was a reliable confidential informant. Piccini, therefore, could rely upon the information provided by CS 2, which was corroborated by Piccini's own observations of defendant and other information provided by CS 1 and CS 2, to conclude there was probable cause that defendant was operating an illegal marijuana grow operation inside 321 Fifth Avenue.

Under those circumstances, Piccini's failure to further investigate to identify the correct owner of 321 Fifth Avenue is not a basis upon which the evidence may be suppressed in this case. <u>See</u> <u>Martin v. Anderson</u>, No. CIV.A.07-CV-2965, 2008 WL 4761734, at *10 (E.D. Pa. Oct. 29, 2008) ("[The police officer] possessed sufficient probable cause to arrest and charge [the criminal defendant]. Thus, he had no constitutional obligation to investigate…[further] for the purpose of discovering exculpatory evidence."). <u>Patterson v. Sch. Dist. Of Philadelphia</u>, No. CIV.A. 99-CV-4792, 2000 WL 1020332, at *6 (E.D. Pa. July 19, 2000) ("Once a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence.").

relied. Thus, to the extent defendant had standing to challenge the search of 321 Fifth Avenue and, even if the magistrate judge lacked probable cause to issue the three search warrants in issue in this case, the good faith exception would apply and the evidence obtained pursuant to the warrants would not be excluded under the Fourth Amendment.

### III. CONCLUSION

For the reasons set forth on the record at the hearing on November 29, 2018, and in this opinion, the motion to suppress evidence (ECF No. 43) filed by defendant will be denied.

An appropriate order follows.

BY THE COURT,

**DATED**:     April 2, 2019          **/s/ JOY FLOWERS CONTI**
Joy Flowers Conti
Senior United States District Judge